IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DICKSON HIDALGO PAREDES, et al., | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | Civil Action No. 15-2929 (JBS/JS) |
| v. | |
| EGG HARBOR TOWNSHIP BOARD OF EDUCATION, et al., | **OPINION UPON RECONSIDERATION** |
| Defendants. | |

APPEARANCES:

Thomas P. Lutz, Esq.
1201 New Road
Suite 334
Linwood, NJ 08221
    Attorney for Plaintiffs

Regina McKenna Philipps, Esq.
MADDEN & MADDEN
108 Kings Highway East
Suite 200
P.O. Box 210
Haddonfield, NJ 08033
    Attorney for Defendants Egg Harbor Township Board of
    Education & Dr. Alicia K. Scelso

Robert P. Merenich, Esq.
GEMMEL, TODD & MERENICH, P.A.
767 Shore Road
P.O. Box 296
Linwood, NJ 08221
    Attorney for Defendants Officer David Algeri, Officer Curt
    Ware, Officer Burns, and Officer Defazio

**SIMANDLE, District Judge:**

I.   **Introduction**

The instant action arises from the alleged violation of Plaintiff D.V.R.'s ("DVR") and his father, Plaintiff Dickson Hidalgo Paredes's ("Plaintiff Paredes" or "Paredes") Fourth Amendment rights by Defendants, Egg Harbor Township ("EHT") Police Officers Ware, Burns, and Defazio ("the Officer Defendants"), and related claims of violations of DVR's constitutional rights by defendants EHT Board of Education and Dr. Alicia Scelso, the vice principal of DVR's high school ("the Board Defendants"). DVR claims, essentially, that his rights were violated as a result of an incident arising out of the alleged theft of a classmate's (James Bower, Jr.) cell phone, and DVR's subsequent suspension from school in relationship to that incident.

This matter is currently before the Court on a motion for reconsideration [Docket Item 82] of this court's December 26, 2017 Opinion and Order [Docket Items 80 & 81]. In that opinion, the Court held that DVR did not have a claim for a violation of his Fourth Amendment rights because the EHT Officers did not commit an unconstitutional warrantless entry when they allegedly entered his home without a search warrant. [Docket Item 80 at 30-31.] The Court also held that no reasonable juror could find for Plaintiffs on their other claims as against both the Board Defendants, id. at 16-27, and the Officer Defendants, id. at 27-

33, and granted summary judgment to the Defendants, terminating the case. Id. at 33; Docket Item 81.

In the instant motion for reconsideration, Plaintiffs argue that the Court misinterpreted the law regarding warrantless entry in analyzing whether summary judgment was appropriate as to Plaintiffs' Fourth Amendment claim. [Docket Item 82-3 at 5-8.] Plaintiffs also press several other grounds for reconsideration (id. at 4-5, 8-17), discussed infra.

For the reasons stated below, Plaintiffs' motion for reconsideration is granted only as to Plaintiffs' claim of warrantless entry (and search) and unconstitutional seizure under the Fourth Amendment and 42 U.S.C. § 1983. Accordingly, this case shall be reopened and Plaintiffs' warrantless entry (and search) claim and Plaintiff DVR's unconstitutional seizure claim against Defendant Officers Ware, Defazio, and Burns shall be reinstated.[1] In all other respects, Plaintiffs' motion for reconsideration lacks merit and will be denied.

The Board Defendants filed a cross-motion for sanctions pursuant to Fed. R. Civ. P. 11. [Docket Item 84.] Defendants are correct that the usual proper course of litigation dictates that

---

[1] Plaintiffs shall not be permitted to continue to pursue DVR's claim that he was arrested without probable cause, however, as the Court's determination that probable cause existed as a matter of law remains in effect and is no longer a fact in dispute. See Fed. R. Civ. P. 56(g).

an appeal be filed when the non-prevailing party merely disagrees with the court's analysis and decision, and that a motion for reconsideration is not usually the most apt vehicle to challenge an unfavorable decision. [Docket Item 84-2 at 62.] Rule 11 sanctions are warranted "only in the 'exceptional circumstances' where a claim or motion is patently unmeritorious or frivolous." Watson v. City of Salem, 934 F. Supp. 643, 662 (D.N.J. 1995)(citing Doering v. Union Cty. Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir. 1988)). However, because Plaintiffs' Motion for Reconsideration is granted in part (although not as to any of the claims against the Board Defendants), the Court, in its discretion, denies the Motion for Sanctions at this time.

The Court will also, in its discretion, deny Plaintiffs' cross-motion for sanctions [Docket Item 86-2 at 1-2], as contained in their Response to the Board Defendants' Motion for Sanctions, because it lacks even colorable merit. See Giles v. Phelan, Hallinan & Schmieg, L.L.P., Civil Action No. 11-6239 (JBS/KMW), 2013 WL 4431274 at *5 (D.N.J. Aug. 14, 2013)("Imposition of sanctions under Fed. R. Civ. P. 11 is discretionary."; declining to impose sanctions or cross-sanctions).

## II.  Background

**A. Factual Background**

The procedural history and underlying facts of this case are described in detail in the Court's December 26, 2017 opinion, see <u>Paredes v. Egg Harbor Township</u>, Civil Action No. 15-cv-2929 (JBS/JS), 2017 U.S. Dist. LEXIS 211519 (D.N.J. Dec. 26, 2017), and are reviewed herein only to the extent necessary to serve as a context for this motion for reconsideration. The Court presumes familiarity with the factual circumstances as laid out in that Opinion.

DVR alleges that, on January 9, 2014, he found an iPhone 5 in his gym bag on the way home from wrestling practice. When he got home, he charged the phone, "called his cousin to ask how much he should ask for the reward since he was 'just looking for a reward,' took out the SIM card so it 'could not be tracked' because he did not want the police to come to his house, and flushed the SIM card down the toilet." [Docket Item 80 at 4, citing DVR Dep. 46:1-53:1, 145:2-13.] The phone actually belonged to James Bower, Jr. ("Bower, Jr."), DVR's teammate on the wrestling team, who discovered that his phone was missing from his locker at the end of practice and reported the missing phone to his coaches. <u>Id.</u> (citations omitted).

Bower, Jr.'s father, Atlantic City Police Officer James Bower ("Bower"), used a GPS tracking system within the iPhone to trace the phone's location to 106 Glenn Avenue, Egg Harbor

Township, New Jersey--Plaintiffs' residence. Id. (citations
omitted). Bower and Bower Jr. traveled to the house to retrieve
the iPhone. On the way, Bower called Defendant Lt. David Algeri
("Algeri") (since deceased) of the E.H.T. Police Department and
asked for assistance. Bower called Algeri again outside the home
and asked for police assistance in order to recover the phone.
Algeri called the dispatcher and asked the dispatcher to send a
unit to the home in response. Id. at 4-5 (citations omitted).

It is undisputed that Plaintiff Paredes was not home when
Bower and Bower, Jr. came to the house to retrieve Bower, Jr.'s
cell phone. It is also undisputed that before any E.H.T. police
officers arrived at the home, DVR had already given the cell
phone back to Bower and had told Bower that he had flushed the
SIM card down the toilet. Id. at 5 (citations omitted).

In his deposition, DVR testified that that evening, as he
was coming out of the home to take out the garbage, Bower and
Bower Jr. approached him angrily, whereupon DVR returned the
phone to Bower. [Docket Item 63-3 at 87.] Bower told Bower Jr.
to call "Dave," but when DVR realized Bower Jr. was going to try
to use the phone, he told both Bowers that he had flushed the
SIM card. [Docket Item 63-3 at 87, 88, 89.] Bower, per DVR,
continued to curse at DVR and also put his hands on DVR Id. at
87. Bower grabbed DVR by the wrist and told him to get on the
ground; both Bowers expressed concern that DVR would run, which

6

DVR answered, "Why would I run, you're in front of my house." Id. at 87-88. When Bower told DVR to get on the ground, he also told DVR that they were pressing charges, and DVR "said, for what? You have already got your phone and I didn't steal it. He was like, well, we tracked it down here, blah, blah, blah, this and that. After that, that's when the cops came." Id. at 88. While they were outside, Bower insisted that DVR keep his hands behind his back and wouldn't let DVR go inside or leave. Id. at 89. DVR could not reach out to anyone for help or wait inside for the police because Bower would not let him: "He told me to get on the floor and if I tried to get up he just told me to get back down." Id. at 91.

After approximately fifteen minutes, E.H.T. police officers arrived in two cars. Id. at 92. However, only two of the officers approached DVR and the Bowers; one stayed in one of the police cars. Id. DVR identified the two officers he interacted with as two white men, both with short hair, and one of whom was taller than the other, but other than that could not identify them. Id. After the officers spoke to the Bowers, the taller one approached DVR and wanted his side of the story; DVR had the impression that the officer wanted him to confess. Id. at 92-93. The officer then told DVR that he had a choice, "either you come to jail or get your parents." Id. at 93. DVR stated that no E.H.T. officer ever touched him that night. Id.

DVR testified that the only instruction the E.H.T. officers gave him was, "Go get your stepmom":

> When I was going to get them -- well, no. They said we're going to come inside and talk to your step -- like, to your guardian, and I said no, I don't want you guys to come in. I want you guys to wait out here. No, no, we want to come in. I was like, I'm telling you guys no, and they were like, we're coming in, just go get your stepmother. And I'm like, I'm not giving you guys the rights to come in. And they were like, go get your stepmother. And then they kept walking. So like, I couldn't just stand there in front of them and hold the door so I was just like whatever, they are inside the house.

Id. at 93. DVR testified that the two officers entered the house and told him to get his stepmother, despite him telling them "multiple times" not to come in the house. Id. at 93-94. His testimony was to the effect that they told him to get his stepmother, then followed closely behind him as he walked towards the house. He expected that they would stop at the door, but when they did not, he told them not to come in; nevertheless, they both entered the house. Id. at 94. DVR testified that he told the police to wait at the door once they were inside, but by the time he retrieved his stepmother and they both went downstairs, the officers were at the foot of the stairs. Id. DVR testified that he could see, from his vantage point upstairs, "them walking around in my house . . . . [T]hem walking around, just looking around." Id. at 93. DVR reiterated:

"They just came into the house. That's all they did. They looked around with their flashlights. That's all they did." Id. at 96.

When DVR came down with his stepmother, the officers had a brief conversation with her (with DVR translating into Spanish), saying, effectively, "how they were going to get court papers because they're pressing charges, so they would be in the mail within the next week or two. They were trying to say that they could take [DVR] into custody right now and then have her come get me, but they were going to let me off." Id. at 95. DVR testified that the conversation took about five minutes:

> I had to translate it. I had to stand there and translate it. And they just kept repeating themselves, repeating themselves.
>
> I asked them to leave. They started getting mad with me because I asked them to leave.

Id. at 96. DVR estimated that the officers were inside his house for approximately ten minutes. Id. at 97. DVR also testified that the two officers "kicked [] around" the garbage that Bower had initially emptied inside the garage, looking for the SIM card. Id. DVR reiterated: "The only thing the police did wrong was that you guys walked in without permission and what Bower did wrong was he put me under arrest and went through my trash." Id. at 101. Although DVR was asked at his deposition regarding the E.H.T. police officers, "They didn't detain you?" he answered, "They didn't tell me anything. They were pretty good

to me, honestly. Like AC police, they were -- they caught an attitude with me, but I mean, that's every cop doing their job." Id. at 102.

Paredes testified at his deposition that DVR's stepmother (his wife) informed Paredes the next morning that the police had been inside the house. Id. at 144.

It appears undisputed that when the three E.H.T. police officers (Defendants Ware, Defazio, and Burns) arrived at the home, none of them had spoken to Algeri or Bower before that time. [Docket Item 80 at 5 (citations omitted).]

In his answers to interrogatories, Defendant Ware denied entering the garage [Docket Item 66-2 at 40] and denied entering the house, stating, "I was at the threshold of an open front door while questioning DVR in the presence of his step-mother." Id. at 41. Ware also states that Defendant Burns "was [] standing in the driveway" while Ware was "at the threshold of an open front door" and that "[n]o EHT officer entered the garage or the home." Id. Ware similarly states that Defendant Defazio "was [] standing in the driveway" while Ware was "at the threshold of an open front door" and that "[n]o EHT officer entered the garage or the home." Id. Ware also stated: "I was at the threshold of an open front door while questioning DVR in the presence of his step-mother. There was no emergency situation or exigent circumstances under these set of facts. I did not

require consent to enter the home under these circumstances. I cannot speak for James Bower but I did not see him or any other officer enter the garage or home." Id. at 43.

Defendant Defazio likewise denied entering "the garage or, for that matter, the home" at any point. Id. at 47. Defendant Burns answered (verbatim)[2] the same. Id. at 54. Defendants Defazio [Docket Item 66-3 at 12-13] and Burns [id. at 8] also denied entering the home, or that Ware entered the home, at their depositions.

DVR subsequently prepared a written statement for Defendant Scelso describing what occurred: "[T]he kid and his father came over saying he is a cop. This happened while I was taking out my trash. They walked up to me and made me get on the ground while I sat down while he was looking through the trash for the phone when I already gave it to him. The Feds came to my house and I told them what happened, but he only listened to his friend and not me. I called my stepmom. I asked them to stay outside, but just walked in. They talked to my stepmom and said paper would

_____

[2] But see Docket Item 66-3, Deposition of Defendant Burns, at 8 ("Q: . . . Did you ever look at the other officers' answers to the plaintiffs' Requests for Admissions? A: No. Q: When you were doing your answers, I don't want to know what you said to your attorney, but did you answer these questions in the presence of your attorney? A: Yes. Q: And did you finish them and sign them in front of your attorney? A: No. Q: What I really want to ask is did any of the other police officers tell you what they were going to put in their answers or suggest to you what you should put in your answers? A: No.").

come in and I would most likely have a court day. Then after an hour they left." [Docket Item 63-3 at 23.]

Following the incident on January 9, 2014, Defendant Ware sent an email to the E.H.T. High School on January 10, 2014, "concerning the charges against" DVR pursuant to the Memorandum of Agreement between the E.H.T. School District and the E.H.T. Police Department. [Docket Item 80 at 6 (citations omitted).] Defendant Scelso called DVR into her office at approximately 7:40 a.m. to discuss the "issue," which was relayed to Scelso to have taken place on school property, after having been alerted to the situation by E.H.T. High School's athletic director, Michael Pellegrino. Id. (citations omitted). DVR told Scelso his version of events, which included that he had been in possession of Bower, Jr.'s cell phone without permission or authority. Id. at 6-7 (citations omitted). Scelso asked DVR to provide a written statement, which he did, at approximately 8:01 a.m. Id. at 7 (citations omitted).

At approximately 9:31 a.m., Scelso received an email from Defendant Ware about "'an incident that occurred in the high school on 1/9/14 during wrestling practice.'" Id. (citing Docket Item 66-3 at 20). Ware's email said that a "cell phone was stolen out of a member of the wrestling team[']s locker that was reportedly locked[,]" that "during the evening of 1/9/14 the phone was located in the possession of a fellow member of the

12

wrestling team" and identified Bower, Jr. as the victim and DVR as "the accused." Id. Detective Sergeant Fred Spano, E.H.T. police officer and official police liason officer to E.H.T. High School, also emailed Scelso additional information about the incident, including the new information that DVR had "stated that he flushed down the toilet." [Docket Item 80 at 8 (citations omitted).]

At approximately 12:00 p.m., Scelso called DVR back into her office and remarked that DVR "had not told her that he removed the iPhone's SIM card and disposed of same. Plaintiff conceded that he did not include that information in the written statement previously provided to Dr. Scelso." Id. (citations omitted). Scelso then told DVR that he was suspended for four days. Id. Scelso contacted Paredes by phone at approximately 1:29 p.m. to inform him of the suspension. Id. at 9. Scelso also sent a written advisory to the "parent/guardian" of DVR regarding the suspension. Id. (citations omitted).

Paredes did not ever tell Scelso that he wished to appeal or challenge the suspension; nor did he ever do so. Id. (citations omitted). The School District's Policy on Pupil Records allows for a procedure for a parent or an adult pupil to challenge a student's record (including a record of a suspension) that involves notifying the Superintendent in writing of the challenged issue and waiting for a determination

13

from the Superintendent which is to be transmitted within ten (10) days, provides for a meeting between the district or its designee to discuss the issue if no agreement is reached, and allows for the parent or adult pupil to appeal the decision to the Board or the Commissioner of Education within ten (10) days, which then has twenty (20) days to render a decision; the Board's decision may then further be appealed to the Commissioner pursuant to N.J.S.A. 18A:6-9 and N.J.A.C. 6A:4. Id. at 12-13 (citations omitted).

### B. Procedural Background

A detailed procedural history of this action is related in the Court's previous Opinion. [Docket Item 80 at 13-14.] The Court presumes the reader's familiarity and recounts only the procedural background to the instant motion.

The Court's Opinion and Order of December 26, 2017 [Docket Items 80 & 81] resolved Plaintiffs' motion for summary judgment [Docket Item 64], as well as the two summary judgment motions filed by the Defendants [Docket Items 63 & 66].

Plaintiffs timely filed the instant Motion for Reconsideration. [Docket Item 82.] The Board Defendants filed a Response in Opposition [Docket Item 83] and a Cross-Motion for Rule 11 Sanctions Docket Item 84]. The Officer Defendants filed a Response in Opposition as well. [Docket Item 85.] Plaintiffs filed a Reply/Response in Opposition to the Sanctions motion,

14

wherein they sought sanctions in relation to the Board

Defendants' sanctions motion. [Docket Item 86.] The Board

Defendants filed a Reply. [Docket Item 87.]


### III. Standard of Review

Local Civil Rule 7.1 allows a party to seek a motion for

reconsideration or reargument of "matter[s] or controlling

decisions which the party believes the Judge or Magistrate Judge

has overlooked . . . ." Local Civ. R. 7.1(i). Whether to grant a

motion for reconsideration is a matter within the Court's

discretion, but it should only be granted where such facts or

legal authority were indeed presented but overlooked. See DeLong

v. Raymond Int'l Inc., 622 F.2d 1135, 1140 (3d Cir.

1980), overruled on other grounds by Croker v. Boeing Co., 662

F.2d 975 (3d Cir. 1981); see also Williams v. Sullivan, 818 F.

Supp. 92, 93 (D.N.J. 1993).

To prevail on a motion for reconsideration, the movant must

show:

> (1) an intervening change in the controlling law; (2) the
> availability of new evidence that was not available when
> the court ... [rendered the judgment in question]; or (3)
> the need to correct a clear error of law or fact or to
> prevent manifest injustice.

U.S. ex rel. Shumann v. Astrazeneca Pharm. L.P., 769 F.3d

837, 848-49 (3d Cir. 2014) (citing Max's Seafood Café ex rel.

Lou—Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir.

1999)). The standard of review involved in a motion for reconsideration is high and relief is to be granted sparingly. U.S. v. Jones, 158 F.R.D. 309, 314 (D.N.J. 1994). "The Court will grant a motion for reconsideration only where its prior decision has overlooked a factual or legal issue that may alter the disposition of the matter. The word 'overlooked' is the operative term in the Rule." Andreyko v. Sunrise Sr. Living, Inc., 993 F. Supp. 2d 475, 478 (D.N.J. 2014) (internal citations and quotation marks omitted). Mere disagreement with the Court's decision is not a basis for reconsideration. U.S. v. Compaction Sys. Corp., 88 F. Supp. 2d 339, 345 (D.N.J. 1999).

## IV.  Discussion

### A. Warrantless Entry & Unconstitutional Seizure

Plaintiffs argues that reconsideration is appropriate because the Court overlooked and misinterpreted the law concerning warrantless entry in holding that summary judgment was appropriate as to Plaintiffs' Fourth Amendment claim because the Defendant EHT Officers, as alleged, lawfully entered his home without a warrant. In particular, Plaintiffs argue that the Court misinterpreted the application of U.S. v. Santana, which allows for police officers to perform a warrantless entry into a home when they begin "hot pursuit" of a suspect in a public

16

place and have probable cause to arrest the suspect who has retreated therein. <u>See</u> 427 U.S. 38, 43 (1976). Although the warrantless entry claim had been properly raised in the Amended Complaint, it was not thoroughly briefed by either Plaintiff or Defendants in their respective filings. However, because the warrantless entry claim is not being raised for the first time in Plaintiffs' motion for reconsideration, the Court can consider this argument based on the existing law concerning warrantless entry.

In this case, Plaintiffs do not argue that there has been an intervening change in the law or that there is new evidence that was unavailable when the Court decided the underlying motion for summary judgment. Therefore, the only remaining basis for reconsideration is the need to correct a clear error of law or fact present in the court's previous opinion. To establish the need to correct a clear error of law or fact, the movant must show that "dispositive factual matters or controlling decisions of law were brought to the court's attention but not considered." <u>P. Schoenfeld Asset Management LLC v. Cendant Corp.</u>, 161 F. Supp. 2d 349, 353 (D.N.J. 2001) (internal quotations and citations omitted). Mere disagreement with the Court's determination is not a basis for reconsideration. <u>Compaction Sys. Corp.</u>, 88 F. Supp. 2d at 345.

Here, Plaintiffs' main argument is that the Court misinterpreted Santana and extended its holding too broadly. The Court agrees. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City v. Stuart, 547 U.S. 398, 403 (2006)(internal quotations omitted). See also Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971)(same). The Fourth Amendment is intended to protect "the sanctity of a man's home and the privacies of life." Payton v. New York, 445 U.S. 573, 584 (1980) (citing Boyd v. U.S., 116 U.S. 616, 630 (1886)). "Because the home is accorded the full range of Fourth Amendment protections, it is beyond question that an unconsented police entry into a residential unit, be it house, apartment, or hotel or motel room, constitutes a search[.]" W.R. LaFave et al., 2 Criminal Procedure, § 3.2(c)(2d ed. 1999).[3] Unless exigent circumstances reasonably exist, police officers may not conduct a warrantless entry into a suspect's home. Ray v. Twp. of Warren, 626 F.3d 170, 177 (3d Cir. 2010). Such exigent circumstances, under which the need for effective law

_____

[3] "Of course, a police officer's mere entry or trespass into a home without consent is enough to constitute a search, often referred to in the case law as an 'unlawful entry.' . . . [A] police officer possesses sensory capabilities, i.e., the ability to obtain information." Reeves v. Churchich, 484 F.3d 1244, 1258 (10th Cir. 2007)(citing Brigham City, 547 U.S. at 401-05; U.S. v. Najar, 451 F.3d 710, 719-20 (10th Cir. 2006); U.S. v. Carter, 360 F.3d 1235, 1238, 1241 (10th Cir. 2004)).

enforcement overcomes the right to privacy, include "hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger of the lives of officers or others." U.S. v. Coles, 437 3d 361, 366 (3d Cir. 2006) (internal citations omitted).

Santana, which was decided before Payton, demonstrated one such exigent circumstance, "hot pursuit," when the police were held to have lawfully entered a home (without a warrant) while continuing their pursuit of a suspect, whom they had probable cause to arrest, after the pursuit began in what was deemed to be a public place. Santana, 427 U.S. at 43.

Furthermore, "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." Welsh v. Wis., 466 U.S. 740, 753 (1984). "The general rule is that the warrantless entry into a person's house is unreasonable per se. See Payton[], 445 U.S. [at] 586[.]" U.S. v. Price, 558 F.3d 270, 277 (3d Cir. 2009). See also Joyce v. City of Sea Isle City, No. 04-5345(RBK), 2008 WL 906266, at *15 (D.N.J. Mar. 31, 2008)("In the absence of exigent circumstances, the 'firm line at the entrance to the house . . . may not reasonably be crossed without a warrant,' even if the police have probable cause that the person committed a crime.")(citing Payton, 445 U.S. at 590).

In Plaintiffs' response to the original motion for summary judgment, they raised a claim of unlawful entry under the Fourth Amendment [Docket Item 69 at 6] and the evidentiary record pointed to a genuine dispute of material fact as to whether Defendant Officers Ware, Defazio, and Burns in fact entered DVR's home. [See, e.g., Docket Items 63-3 at 93-96; 66-2 at 40-43.]

Here, under Plaintiffs' factual version, the Defendant Officers' alleged warrantless entry did not involve exigent circumstances that would necessitate their entrance into the home. Exigent circumstances, as noted in Coles, include hot pursuit, the possible destruction or removal of evidence, or imminent danger to life. None of these, nor analogous other circumstances, existed in Plaintiffs' case. The Egg Harbor Township officers knew, before they allegedly entered the house, that DVR had returned the cell phone, and DVR had already admitted to flushing the phone's SIM card. As such, the officers had no reason to believe that DVR entered (or remained within) his home to destroy or remove further evidence. Furthermore, there was no reason to believe that anyone's life was in danger or that the Defendant Officers allegedly followed DVR into his home in "hot pursuit." Regardless, per Welsh, an exigent-circumstances exception is unlikely to apply since theft of a cell phone--since returned, no less--is a minor offense. Cf.

Hopkins v. Bonvicino, 573 F.3d 752, 768 (9th Cir. 2009)("Even if the officers had probable cause that Hopkins had been driving under the influence (and even if that would have been sufficient for entry into his home pursuant to a warrant, more is required to justify a warrantless entry into his house.")(emphasis in original).

Moreover, the Officer Defendants did not argue for some other exception to the warrant requirement of the Fourth Amendment in their moving papers for summary judgment, e.g., consent. Accordingly, the Court finds no alternative grounds for granting summary judgment in favor of the Defendant Officers on Plaintiff's warrantless-entry Fourth Amendment claim. Material facts are in dispute regarding the alleged warrantless entry, and this dispute cannot be resolved on summary judgment.

Therefore, the Court finds that Plaintiffs adduced sufficient evidence to allow a reasonable finder of fact to conclude that the Officers Ware, Defazio and/or Burns entered DVR's house without a warrant and in violation of the Fourth Amendment and § 1983. Such a claim may go forward as to DVR as well as to Plaintiff Paredes, although Plaintiff Paredes was undisputedly not present at the time of the incident. See, e.g., O'Donnell v. Brown, 335 F. Supp.2d 787, 819 n.15 (plaintiffs' "Fourth Amendment claim is . . . for unlawful entry of their home, and this is a claim they may assert because they have a

privacy interest in their home, whether or not they were present at the time of the entry. See, e.g., Michigan v. Clifford, 464 U.S. 287, 295 (1984)."); Brower-McLean v. City of Jersey City, No. 05-5150 (PGS), 2008 WL 4534062, at *8 (D.N.J. Oct. 6, 2008)(same).[4] The Court's prior Opinion granting summary judgment to the Defendants Ware, Defazio, and Burns on this claim is therefore vacated and their motion for summary judgment as to this claim of warrantless entry without consent is likewise denied. Genuine disputes of material fact exist as to whether Defendants Ware, Defazio, and Burns violated the Fourth Amendment rights of DVR and/or Plaintiff Paredes to be free from unreasonable searches by entering their home without a warrant and without exigent circumstances, notwithstanding that they had probable cause to arrest DVR for a crime.[5]

The Court next turns to Plaintiff DVR's claim of false arrest. Fourth Amendment claims based on seizure of the person are subject to analysis via "a three-step process": first, whether the plaintiff "was seized"; second, "whether that seizure violated the Fourth Amendment's prohibition against unreasonable seizures"; and third, "which of the defendants, if

---

[4] See also Bumper v. North Carolina, 391 U.S. 543, 548 n.11 (1968)(criminal defendant had standing to challenge search based on his grandmother/co-tenant's purported consent, although he was not present).
[5] See Section IV.C., infra.

any, may be held liable[.]" <u>Berg v. Cty. of Allegheny</u>, 219 F.3d 261, 269 (3d Cir. 2000).

The Court does not agree, as Plaintiffs urge in the Motion for Reconsideration [Docket Item 82 at 5-6], that the Officer Defendants lacked probable cause to arrest DVR for theft or a related offense; accordingly, the Officer Defendants also had justification to seize DVR in a less intrusive fashion than formal arrest, <u>i.e.</u>, by restricting his freedom of movement.[6] However, this does not end the inquiry.

Just as warrantless entries into the home are prohibited, so too are warrantless arrests made inside the home absent exigent circumstances or consent. <u>See</u> <u>Welsh</u>, 466 U.S. at 749 ("warrantless . . . arrests in the home are prohibited by the Fourth Amendment, absent probable cause <u>and</u> exigent circumstances")(emphasis added)(citing <u>Payton</u>, 445 U.S. at 583-90).

---

[6] <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (seizure under Fourth Amendment occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen"); <u>Florida v. Bostick</u>, 501 U.S. 429, 436-37 (1991)(where person's freedom of movement is "restricted by a factor independent of police conduct[,]" the "appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter" or whether "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' [<u>Michigan v.</u>] <u>Chesternut</u>, 486 U.S. [567,] 569 [(1988)].")

As the Court stated in <u>Welsh</u>:

> Before agents of the government may invade the
> sanctity of the home, the burden is on the government
> to demonstrate exigent circumstances that overcome the
> presumption of unreasonableness that attaches to all
> warrantless home entries. <u>See</u> <u>Payton</u>[], 445 U.S. at
> 586 . . . . When the government's interest is only to
> arrest for a minor offense, that presumption of
> unreasonableness is difficult to rebut[.]

466 U.S. at 750. Moreover, the Third Circuit has stated

explicitly that "a warrantless <u>seizure</u> in a person's home

violates the Fourth Amendment unless both probable cause and

exigent circumstances are present[,]" (rather than simply a

warrantless <u>arrest</u>). <u>Est. of Smith v. Marasco</u>, 318 F.3d 497, 518

(3d Cir. 2003)(emphasis added).[7]

The Court does not alter or modify its previous holding

that the evidence adduced at summary judgment does not create a

genuine dispute of material fact that DVR was arrested by the

Officer Defendants, nor that DVR was ever placed into formal

custody as a result of the allegations and this incident, <u>see</u>

Docket Item 80 at 32-33, citing <u>Colbert v. Angstadt</u>, 169 F.

Supp. 2d 352, 358 (E.D.Pa. 2001)(plaintiff "was not formally

---

[7] <u>But see</u> <u>Cronin v. West Whiteland Twp.</u>, 994 F. Supp. 595, 601-02
(E.D.Pa. 1998)(noting "an important distinction in Fourth
Amendment jurisprudence--that between a warrantless <u>entry</u> into
the home and a warrantless <u>arrest</u> once inside the home" and
holding, based on <u>Sheik-Abdi v. McClellan</u>, 37 F.3d 1240, 1245-46
(7th Cir. 1994), that "once a peace officer has entered the home
lawfully [<u>e.g.</u>, for another reason,] he or she may execute an
arrest upon probable cause without a warrant, as if the arrest
was executed in a public place").

arrested" nor experienced "a restraint on freedom of movement of the degree associated with a formal arrest" for purposes of state "false arrest" claim where he "was not handcuffed, fingerprinted, or taken to the police station, and . . . did not receive a citation" but rather "[l]ater . . . received a summons in the mail, giving him a date to appear in court. No bond was posted and no warrant was required to secure his appearance.")(citations omitted). The Court's prior grant of summary judgment to the Defendant Officers on DVR's claim that they arrested him without probable cause is not vacated; the findings that the Officer Defendants had probable cause and that they did not formally arrest DVR remain in effect as a matter of law. See Fed. R. Civ. P. 56(g).[8]

However, the Court finds that the evidence earlier adduced does create a genuine dispute of material fact as to whether DVR was temporarily _seized_ by the Officer Defendants pursuant to a warrantless entry inside his home in some lesser fashion, _i.e._, had his freedom of movement restrained upon the Officer Defendants engaging in conduct that would have communicated to a reasonable person in DVR's position that he was not free to

---

[8] "Failing to Grant All the Requested Relief. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact -- including an item of damages or other relief -- that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

"ignore the police presence and go about his business."
Chesternut, 486 U.S. at 569.

Plaintiffs' original motion for summary judgment identifies this claim [Docket Item 69 at 8], albeit less than clearly pins it to the specific conduct of the E.H.T. Officers at the time that they were allegedly inside the home. However, the evidentiary record before the Court contains DVR's testimony that the officers, in response to DVR asking them to leave, instead "started getting mad with me because I asked them to leave." [Docket Item 63-3 at 96.] This is sufficient, to the Court's mind, to suggest that DVR's freedom of movement was restrained inside the house, because he was not free to terminate the encounter; when he tried to terminate the encounter, he testified, the police instead "started getting mad" with him.

The place of the alleged detention makes a difference; if there has been a warrantless entry into the plaintiff's home (lacking exigent circumstances or consent) and the police have detained plaintiff therein by meaningfully restraining his movement, the temporary seizure of the plaintiff crosses the constitutional line protecting the threshold of his home. The Court notes some tension in applying Payton to revive Plaintiff DVR's unconstitutional seizure claim where, as here, there was probable cause to arrest but no arrest actually ensued. Payton

reflects the considered view that the Fourth Amendment's warrant requirement must be honored, particularly with respect to police conduct inside the home. That said, it is not self-evidently the case that the Officer Defendants could have applied to a neutral and detached magistrate for a warrant to conduct a lesser seizure (e.g., a Terry stop) inside DVR's home, and so there is something of a conceptual leap in extending Payton's bar on warrantless arrests inside the home (because officers could have and should have sought a warrant) to a seizure inside the home where, arguably, officers could not reasonably have sought a warrant.

Nevertheless, the Court is persuaded that reviving Plaintiff DVR's unconstitutional seizure claim by vacating the grant of summary judgment to the Officer Defendants on that claim is the best course of action. This holding does not, of course, grant summary judgment to Plaintiffs on such claim, and a finder of fact is free, in due course, to find that the Officer Defendants did not unconstitutionally seize DVR inside the home. Whether a constitutional violation for seizing DVR inside the home occurred will, of course, depend upon Plaintiffs first proving a warrantless entry without consent or exigent circumstances.

The wisdom of "extending" Payton to a seizure inside the home that falls short of a formal arrest is clear, to this

Court, from several decisions in the Circuit courts that have held plainly that "the usual rules pertaining to Terry stops do not apply in homes." U.S. v. Martinez, 406 F.3d 1160, 1165 (9th Cir. 2005). See U.S. v. Myers, 308 F.3d 251, 258 (3d Cir. 2002)("Terry has never been applied inside a home.").[9] Moreover, at least two Circuits have pointed out that not applying Payton to seizures that amounted to less than a full arrest would have the effect of protecting people against whom the police have probable cause more than those people against whom the police only have a reasonable and articulable suspicion of wrongdoing-- thereby affording less protection to those who are comparatively more likely to be innocent.[10]

---

[9] See also Moore v. Pederson, 806 F.3d 1036, 1039 (11th Cir. 2015)("[I]n the absence of exigent circumstances, the government may not conduct the equivalent of a Terry stop inside a person's home."); U.S. v. Crapser, 472 F.3d 1141, 1149 (9th Cir. 2007)("Our cases establish that Terry does not apply inside a home")(emphasis in original); Sledge v. Stoldt, 480 F. Supp. 2d 530, 534 n.5 (D. Conn. 2007)("Terry . . . does not provide an exception to the requirement that an officer must obtain a warrant to enter an individual's home to detain the individual or arrest the individual"); Wilson v. Jara, 866 F. Supp. 2d 1270, 1290 (D.N.M. 2011)("The Tenth Circuit has repeatedly held that, absent exigent circumstances, official acting under the color of authority and without a warrant may not seize a person inside their home, or effect a seizure by ordering a person inside a home to come to the door")(emphasis added; citations omitted).

[10] See U.S. v. Saari, 272 F.3d 804, 809 (6th Cir. 2001)("Payton's holding that warrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances, applies to this case regardless of whether the officers at issue were conducting an arrest or an investigatory detention. Additionally, if the Court accepted the Government's legal

The Court notes that many decisions have described a finding of a lack of probable cause to be a necessary prerequisite for success on a "false arrest" claim under the Fourth Amendment and § 1983; conversely, the existence of probable cause has been described as a "complete defense" to a Fourth Amendment false arrest claim. See, e.g., Safa v. City of Phila., No. 2:13-cv-5007-DS, 2015 WL 3444264, at *10 (E.D.Pa. May 29, 2015)("in a Section 1983 claim of unlawful (or false)

---

argument, it would have the effect of providing lesser protection to individuals in their homes when the police do not have probable cause to arrest. It would defy reason to hold, as the Government suggests, that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest."); Fisher v. City of San Jose, 509 F.3d 952, 959-60 (9th Cir. 2007)("the Payton warrant requirement[] necessarily applies . . . to in-house seizures that do not amount to a formal arrest. . . . [T]he special status of in-house seizures recognized in Payton means that 'probable cause is a precondition for any warrantless entry to seize a person in his home.' LaLonde [v. Cty. of Riverside], 204 F.3d [947,] 954 [(9th Cir. 2000)]. . . . For similar reasons, any in-house seizure must be subject to the warrant requirement as well, absent an applicable exception. We agree in this regard with the Sixth Circuit [in Saari] . . . . It therefore does not matter for present purposes whether any seizure of Fisher that occurred before he was taken into custody at the conclusion of the standoff would have amounted to an arrest or only to a Terry seizure had the seizure occurred outside the home. Either way, a warrant was presumptively required."), rev'd in part on other grounds, en banc, 558 F. 3d 1069, 1074-75 (9th Cir. 2009)(parties agreed that plaintiff was "for legal purposes, seized inside his home, and as such, the burden is on the police to show either that they obtained a warrant or that some exception to the warrant requirement excused officers from getting one" although parties also agreed that "there was probable cause to arrest" the plaintiff at the time he was seized).

arrest the plaintiff must show he or she was arrested without

probable cause.")(citing Dowling v. City of Phila, 855 F.2d 136,

141 (3d Cir. 1988)("The proper inquiry in a Section 1983 claim

based on false arrest . . . is not whether the person arrested

in fact committed the offense but whether the arresting officers

had probable cause to believe the person arrested had committed

the offense"); Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 118-

19 (2d Cir. 1995)("There can be no federal civil rights claim

for false arrest where the arresting officer had probable

cause")(citing Bernard v. U.S., 25 F.3d 98, 102 (2d Cir.

1994))[11]. However, none of those cases were addressing the

situation here, where probable cause may have been present to

seize the person, but the alleged seizure occurred in the home

---

[11] The Court notes that, although many cases, see, e.g., Weyant
v. Okst, 101 F. 3d 845, 852 (2d Cir. 1996) cite to Singer and
Bernard for the proposition that "probable cause" is a "complete
defense" to a false arrest claim under § 1983 as well as under
state tort claims for false arrest, Singer's holding to that
effect cites Bernard, which actually considers whether the
plaintiff could claim "false arrest under New York law" and
holds that "the existence of [probable cause] is a complete
defense to an action for false arrest[,]" citing Zanghi v. Inc.
Village of Old Brookville, 752 F.2d 42, 45 (2d Cir. 1985).
Zanghi, in turn, states that it "is abundantly clear that a
finding of probable cause will defeat state tort claims for
false arrest, false imprisonment and malicious prosecution." Id.
(emphasis added)(citing Feinberg v. Saks & Co., 443 N.Y.S.2d 26
(App. Div. 2d Dep't 1981)("probable cause" constitutes "complete
defense to a cause of action for false arrest or imprisonment"
as well as "malicious prosecution" in state tort case; no claims
under § 1983 pled or pursued)(citing Mullen v. Sibley, Lindsey &
Curr Co., 421 N.Y.S.2d 490, 493-94 (App. Div. 4th Dep't
1979)(same))).

30

without a previous lawful entry into the home, whether by

exigent circumstances or consent. Such police conduct is, the

Court is persuaded, unconstitutional as violative of the Fourth

Amendment, under Payton and its progeny. Accordingly, it is

actionable in a § 1983 claim. See 42 U.S.C. § 1983 ("Every

person who, under color of any statute, ordinance, regulation,

custom, or usage, of any State . . . subjects . . . any citizen

of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable

to the party injured in an action at law, suit in equity, or

other proper proceeding for redress[.]").[12]

Because Plaintiffs, in their original response to the

Motions for Summary Judgment, pointed to evidence in the record

---

[12] See, e.g., Morse v. Fitzgerald, No. 10-CV-6306 CJS, 2013 WL
1195036, at *7 (W.D.N.Y. Mar. 22, 2013)(rejecting defendant
officer's claim that "the warrantless arrest [inside the
plaintiff's home] was lawful, since he had probable cause"). But
see Schwartz v. Coulter, No. 91 C 7954, 1993 WL 398578, at *2-8
(N.D. Ill. Oct. 6, 1993)(granting summary judgment on § 1983 and
state tort "false arrest" claims where officers had probable
cause, but denying summary judgment on § 1983 warrantless entry
claim pursuant to Payton); Breitbard v. Mitchell, 390 F. Supp.
2d 237, 245-49 (E.D.N.Y. 2005)(granting summary judgment on
state and § 1983 "false arrest" claims where arrest was
supported by probable cause, but denying summary judgment on
"unreasonable seizure" claim, in alleged violation of the Fourth
Amendment, where it was "undisputed that plaintiff was arrested
without a warrant on misdemeanor and [non-criminal] violation
charges inside her own home" on Payton grounds where exigent
circumstances were lacking).

to support the existence of a genuine dispute of material fact as to whether Plaintiff's freedom of movement was restrained (thus constituting a "seizure" by the Officer Defendants, although the evidence undisputedly does not allow for a reasonable finding that DVR was formally arrested within the home--or, indeed, at any point) once the Officer Defendants entered the home without a warrant, and because the Officer Defendants cannot effectively claim the existence of exigent circumstances rendering such seizure inside the home reasonable as a matter of law, Plaintiff's claim for unlawful seizure, in violation of the Fourth Amendment and § 1983, shall also be revived. See Hopkins, 573 F. 3d at 773 ("The Fourth Amendment protects against warrantless arrest inside a person's home in the same fashion that it protects against warrantless searches of the home, which is to say that police officers may not execute a warrantless arrest in a home unless they have both probable cause and exigent circumstances. . . . [B]ecause Hopkins was in fact seized inside his home, [the o]fficers . . . violated his Fourth Amendment rights by arresting him without a warrant for the same reasons that their emergency and exigency defenses fail to justify their warrantless entry.").

Accordingly, summary judgment as to Plaintiff Paredes's and DVR's claim for unconstitutional search (namely, the warrantless entry) shall be VACATED, and the Officer Defendants' motion for

such summary judgment shall be DENIED. Additionally, summary judgment as to DVR's claim for unconstitutional seizure (namely, the alleged restraint on his liberty within the home) shall be VACATED IN PART, and the Officer Defendants' motion for such summary judgment shall be DENIED to the extent DVR claims he was detained by the officers in his home following a warrantless entry, and GRANTED to the extent Plaintiff DVR claims he was arrested and that the officers lacked probable cause to arrest him. The former claims may proceed.[13]

The Court thus turns to the other contentions in Plaintiffs' motion for reconsideration.

### B. "Exhaustion"

Plaintiffs argue that the Court erred in "rul[ing] that the Plaintiff, DVR or his parents had a duty to exhaust an administrative remedy by appealing DVR's high school suspension to the E.H.T. Board of Education." [Docket Item 82-3 at 4.] This contention lacks merit.

---

[13] Plaintiffs' concomitant state law claim for civil trespass will not be revived at this time, as it appears beyond peradventure that Plaintiffs cannot demonstrate damages in excess of $3,600 or a permanent injury as a result of Defendants Ware, Defazio, and Burns's alleged trespass, see N.J.S.A. 59:9-2(d), and vacating the dismissal of that cause of action would be futile. Cf. Antoine ex rel. Atoine v. Rucker, No. 03-3738(DRD), 2006 WL 1966649, at *16 (D.N.J. July 12, 2006); Rizzo v. Bergen Cty. Bd. of Soc. Servs., No. L-2926-12, 2017 WL 382913, at *4 (Sup. Ct. N.J. App. Div. Jan. 27, 2017).

Plaintiffs argue that there is no duty to exhaust a state administrative remedy before bringing suit in federal court pursuant to § 1983. The Court agrees. <u>See</u>, <u>e.g.</u>, <u>Holland v. Rosen</u>, 277 F. Supp. 3d 707, 737 (D.N.J. 2017)("The most salient difference is that relief under § 2241 requires a plaintiff to have exhausted state remedies before seeking federal relief, while § 1983 has no such exhaustion requirement.").

This does not affect the Court's earlier conclusion, however, that, when pressing a <u>procedural due process claim</u> under the Fourteenth Amendment (and, accordingly, § 1983), "a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir. 2000). Assuming <u>arguendo</u> that a plaintiff has satisfied the first step of a procedural due process claim analysis by showing that "the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property[,]'" the plaintiff must nevertheless proceed to the second step wherein the court analyzes "whether the procedures available provided the plaintiff with 'due process of law.'" <u>Id.</u> (citations omitted). This second step is not a question of exhaustion; rather, it goes to the question of whether the plaintiff was actually deprived of procedural due process: "A due process violation 'is not complete when the deprivation

34

occurs; it is not complete unless and until the State fails to provide due process.'" Id. (citing Zinerman v. Burch, 494 U.S. 113, 126 (1990)). The Third Circuit continued:

> If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants. See McDaniels v. Flick, 59 F.3d 446, 460 (3d Cir. 1995); Dwyer v. Regan, 777 F.2d 825, 834-35 (2d Cir. 1985), modified on other grounds, 793 F.2d 457 (2d Cir. 1986); Riggins v. Bd. of Regents, 790 F.2d 707, 711-12 (8th Cir. 1986).
>
> This requirement is to be distinguished from exhaustion requirements that exist in other contexts. Alvin appears to conflate the two and contends, as an alternative to his claim that he attempted to use the available procedures, that he need not go through the processes available because of the general rule that there is no exhaustion requirement for 42 U.S.C. § 1983 claims. See Patsy v. Bd. of Regents of Florida, 457 U.S. 496, 516 (1982)[14]; Hohe v. Casey, 956 F.2d 399, 408 (3d Cir. 1992). However, exhaustion simpliciter is analytically distinct from the requirement that the harm alleged has occurred. Under the jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies.

Alvin, 227 F.3d at 116 (emphasis added).

Nothing in Plaintiffs' motion for reconsideration suggests the Court overlooked any controlling case law or erred in its application of the principles espoused in Alvin to the case at hand. The Court manifestly did not hold that Plaintiffs failed to satisfy a (non-existent) exhaustion requirement for claims

---

[14] See Docket Item 82-3 at 5 (citing Patsy).

brought under § 1983; rather, the Court held that Plaintiffs'
procedural due process claim failed as a matter of law pursuant
to Alvin. [Docket Item 80 at 17-19.] Plaintiffs' motion for
reconsideration on this ground is therefore denied.

### C. Basis for Suspension

Plaintiffs' motion for reconsideration next argues that the
Court erred in "believ[ing] that Plaintiff DVR's high school
suspension was based on his disposing of the SIM card from the
cell-phone which he found." [Docket Item 82-3 at 8.]

Plaintiffs argue that, although "the Court evidently
believed that Dr. Scelso suspended DVR for removing the SIM
card[,]" Dr. Scelso testified that the fact that DVR flushed the
SIM card down the toilet did not "factor at all in [her]
decision-making as to whether or not a theft had occurred" and,
"[t]herefore, Dr. Scelso's suspension of DVR and her expulsion
of him from the wrestling team were based solely on the police
e-mails, both of which inferred a crime of theft by DVR, but
based on no evidence." Id. at 9-10.

First, Plaintiffs do not identify where in the Court's
previous Opinion such a "mistaken" "belief" was expressed. It
was not. The Court found, instead, that "the record is void of
any evidence of misconduct or abuse committed by the Board
Defendants that could ever be found to 'shock the conscience,"

and granted summary judgment on Plaintiffs' substantive due process claims. [Docket Item 80 at 20.] The Court stated:

> [T]his was a situation where a student, [DVR], admitted to being in the possession of another student's valuable cell phone, taken without that other student's permission on school property. Additionally, [DVR] admitted to the police that he took the SIM card out of the phone and flushed it down the toilet, which is undisputed evidence of his efforts to avoid detection. This information was relayed to Dr. Scelso. However, when [DVR] initially communicated his version of the events that took place to Dr. Scelso, he omitted the fact that he flushed the SIM card down the toilet so it "could not be tracked." Relying on this information, Dr. Scelso acted within her discretion and issued a four-day suspension[.]

Id. at 21. The Court discerns no error.

Second, it distorts the evidentiary record beyond recognition to say that Dr. Scelso suspended DVR "based on no evidence." In fact, it distorts the meaning of the word "evidence." The undisputed evidence shows that Dr. Scelso suspended DVR after the emails from the officers regarding the incident[15] and after talking to DVR [Docket Item 63-3 at 32.] All

---

[15] Plaintiffs repeatedly press the claim that the emails were somehow improper because the wrong police officer sent the email to Dr. Scelso and because "the Memorandum of Agreement only allows a written (e-mail-type) report if the off-campus incident involved weapons, drugs, or imminent threats made to fellow students or faculty." [Docket Item 82-3 at 9.] While none of these alleged procedural irregularities rise to the level of a constitutional violation, the Court notes this argument as further illustration that Plaintiffs do not understand the import of circumstantial evidence, or that reasonable inferences may be made when determining probable cause.

For instance, probable cause to believe that DVR stole the phone on campus may have been reasonably inferred from the

undisputed facts that 1) Bower, Jr., reported that the phone went missing from his gym locker on campus; 2) DVR was subsequently located in possession of the phone without permission or authority from Bower, Jr. or a reasonable lawful explanation for his possession thereof (see Barnes v. U.S., 412 U.S. 837, 844 (1973)("For centuries courts have instructed juries that an inference of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods")); and 3) DVR flushed the SIM card down the toilet in an attempt to conceal his possession of the phone, an act which is probative (albeit not dispositive) of consciousness of guilt. Moreover, it is undisputed that DVR initially did not tell Dr. Scelso that he flushed the SIM card, only admitting that he did so when confronted by Dr. Scelso--this omission could also reasonably have led Dr. Scelso (or a reasonable state actor in her possession) to have probable cause to believe that DVR stole the cell phone on campus.

This is so entirely regardless of the fact that no eyewitness has emerged to affirmatively state, "I saw DVR steal the phone from the locker," that DVR denies stealing the phone, or any other allegedly exculpatory evidence (or alleged lack of directly inculpatory evidence) that Plaintiffs seek to elevate to the status of dispositive of DVR's innocence. Nor did any of the relevant actors turn a blind eye to evidence that would exonerate (or tend to exonerate) DVR; instead, for example, Dr. Scelso considered and reasonably credited (or declined to credit) DVR's denials and the lack of dispositive, airtight evidence and ultimately concluded, from the totality of the evidence before her, that DVR should be suspended for four days. Cf. Tisdale v. City of Phila., 688 F. App'x 136, 137-38 (3d Cir. 2017)(police officer had probable cause to arrest plaintiff for theft where eyewitness identified plaintiff to police officer, although plaintiff argued that his clothing did not match what the eyewitness reported and no evidence of the stolen items was recovered from his person although the eyewitness followed the perpetrator in her vehicle for some time while on the phone with the 911 operator and later "converged" with the plaintiff and the police officer, whereupon the eyewitness identified the plaintiff as the thief; "[d]isagreement over the precise colors of Appellant's clothing does not negate the identification by Lee in the face of Gibson's testimony indicating that it was reasonable to believe Lee was telling the truth").

To be clear: this Court does not decide, nor assume, that DVR actually stole the cell phone. Indeed, the Court accepted his denials for the purposes of determining Defendants' motions for summary judgment. The Court likewise credited DVR's

of those sources of information allowed her to reasonably

conclude that DVR stole the cellphone--his denials

notwithstanding, as she was not required to credit them--and it

cannot fairly be said that she made that determination "based on

no evidence." [Docket Item 82-3 at 10.]

Plaintiffs seem to be under the misapprehension that

probable cause in a criminal case requires something akin to a

videotape of the crime and a full confession. See, e.g., Pl.

Mot. at 5-6 (DVR handed the phone to Officer Bower "explaining

that he did not steal the phone but **found** the phone in his bag.

. . . Ware . . . knew DVR had just handed Off. Bower the cell-

phone; E.H.T. Officer Ware also heard DVR say that he found the

phone. There was yet no witness, and never would be any witness,

to say that DVR stole the phone or even tried to access his

---

testimony that he flushed the SIM card simply because he did not
want police coming to his house, but that he intended to return
the cell phone the next day, for the purposes of those motions.
[Docket Item 63-3 at 62-63.] Similarly, the Court credited DVR's
explanation that he lacked sufficient opportunity to steal the
phone during wrestling practice, id. at 65, and that he told
Scelso verbally that he flushed the SIM card but simply did not
include that in his written statement, id. at 66. However,
crediting those explanations does not equal concluding that the
relevant state actors acted on the basis of "no evidence" or
lacked probable cause to believe that he did steal the cell
phone. Accordingly, no constitutional violation is evident.
Again, the issue is not whether there exists uncontroverted
proof of guilt beyond a reasonable doubt; the issue instead is
whether any reasonable factfinder could conclude that the
circumstantial and direct evidence known to Dr. Scelso failed to
present probable cause for disciplinary action.

classmate's gym locker. Thus, there was never any probable cause
to charge DVR 'for committing the crime of theft'")(emphasis in
original); id. at 10 ("Dr. Scelso admitted she knew of no
factual evidence, nor any person at E.H.T. High School who had
any evidence, that a cell-phone was actually stolen or that a
locker had been broken into at all."). This is manifestly not
the case.

As has been repeatedly stated, "[p]robable cause exists
when, based on the factual circumstances, a prudent person could
believe that a particular suspect has committed or is committing
an offense. See Sharrar v. Felsing, 128 F.3d 810, 817-18 (3d
Cir. 1997); Islam v. City of Bridgeton, 804 F. Supp. 2d 190, 197
(D.N.J. 2011)." [Docket Item 80 at 24.] Under New Jersey law,
probable cause existed, based on the undisputed facts in the
record, to believe that DVR had committed or was committing an
offense.[16]

---

[16] See Docket Item 80 at 24 (citing N.J.S.A. § 2C:20-3 and the
"EHTHS Disciplinary Code"). See also N.J.S.A. § 2C:20-7,
"Receiving Stolen Property" ("A person is guilty of theft if he
knowingly receives or brings into this State movable property of
another knowing that it has been stolen, or believing that it is
probably stolen. It is an affirmative defense that the property
was received with purpose to restore it to the owner.
'Receiving' means acquiring possession, control or title, or
lending on the security of the property."). See also People v.
Mitchell, 164 Cal. App. 4th 442, 462-63 (Ct. App. 3d Dist.
2008)("It is often the case with theft-related offenses that the
People do not have direct evidence of the theft of the victims'
property. Although circumstantial evidence of a defendant's
opportunity to steal the items and later possession of them

Circumstantial evidence is evidence. A determination of probable cause--or even the much higher burden of guilt beyond a reasonable doubt--may be satisfied by the consideration and acceptance of circumstantial evidence. See, e.g., State v. Dancyger, 29 N.J. 76, 84 (1959)("The evidence presented by the State was wholly circumstantial. However, if this evidence is of sufficient quality to convince a jury beyond a reasonable doubt of the defendant's guilt, it does not matter that it is circumstantial. It has often been said that circumstantial evidence is not only sufficient but may also be more certain, satisfying and persuasive than direct evidence.")(internal citations and quotation omitted); Gov't of V.I. v. Joseph, 465 F. App'x 138, 141 (3d Cir. 2012)(third element of "possession of stolen property," "that the defendant knew or had cause to believe that the property was obtained in an unlawful manner,

---

would suggest he was the thief, it is a safer bet to prosecute for receiving stolen property. That appears to be the case here. Circumstantial evidence of defendant's opportunity to steal property while working for Billy C. coupled with her later possession of that property suggests she was the thief. Nevertheless, it is conceivable someone else stole the property and passed it on to defendant. Therefore, with uncontradicted evidence of defendant's possession of the property under circumstances suggesting it had been stolen by someone, the People may have considered prosecution for receiving stolen property the more prudent course").

The Court notes that the court in Mitchell described "prosecuting for receiving stolen property" as the more prudent course, not dropping the prosecution entirely for lack of probable cause and the attendant fear of a § 1983 lawsuit.

was sufficiently proven by substantial circumstantial

evidence")(citing <u>U.S. v. McNeill</u>, 887 F.2d 448, 450 (3d Cir.

1989)).[17]

---

[17] <u>See also</u> <u>U.S. v. Allegrucci</u>, 258 F.2d 70, 77 (3d Cir.
1958)("The unexplained appearance in defendant's possession in
Scranton, Pennsylvania, of goods placed on platforms in New York
for shipment to such distant places as Fort Worth Texas,
Clarksburg, West Virginia, and Warrington, Florida, and his
sales of the goods for about half their retail price through a
grocery clerk and delivery boy were facts from which the jury
could have properly found that the goods had been stolen from
the platforms and that defendant knew they had been stolen");
<u>Thompson v. U.S.</u>, No. 12-1312, 2015 WL 1344793, at *4-5 (D.N.J.
Mar. 23, 2015)(law enforcement used GPS tracker to track money
stolen in bank robbery to "van driven by Petitioner," petitioner
"led police on a high speed chase and fled on foot after
crashing the van[,]" the van "contained the stolen money, the
gun used in the robbery, and items worn by the robbers during
the robbery" and an expert testified "that DNA from the hat and
mask worn during the robbery belonged to Petitioner"; "This
evidence, albeit circumstantial is more than sufficient to
sustain Petitioner's convictions. This Court notes that
Petitioner's habeas petition proceeds from the faulty premise
that circumstantial evidence is inherently unreliable and that a
conviction can only be sustained by direct evidence. That
argument has been soundly rejected by both the Third Circuit and
the United States Supreme Court")(citations omitted); <u>U.S. v.
Rocco</u>, 99 F. Supp. 746, 748 (W.D. Pa. 1951)(From defendant's
"possession and the furtive manner of disposition of some of the
bonds . . . the jury was justified in inferring that the
defendant knew that the bonds were stolen and that, at least, he
had aided and abetted or caused them to be transported in
interstate commerce"); <u>U.S. v. Andrews</u>, 675 F.2d 962, 964 (8th
Cir. 1981)("There was evidence that placed the defendant at the
site of the theft near the time it was stolen. Add to this his
possession of the stolen goods a day later, his failure to
adequately explain that possession and his actions after the
crime; and it is clear that the guilty verdict was supported by
sufficient evidence" although defendant testified under oath
that he did not know item was stolen; "government [also]
argue[d] that because of the unbelievable nature of the
defendant's explanation, the out-of-court statements [defendant
made to law enforcement saying the same] were tantamount to a

Here, a determination by the relevant state actors that probable cause existed, even if all reasonable inferences on the undisputed evidence in the record are drawn in favor of Plaintiffs, was reasonable. This is so notwithstanding that DVR denied stealing the phone. DVR was at the wrestling practice where the phone went missing. He admitted to transporting it from the locker room in his bag, whether or not he knew it was in his bag. The phone was found in his possession, without permission or authority by the phone's owner, and DVR admittedly intentionally flushed the SIM card to prevent the police from coming to his house over the cell phone, which a reasonable observer may conclude is evidence of consciousness of guilt. See Silverman v. Lazaroff, No. 2:07-cv-01233, 2009 WL 2591676, at *26 (S.D. Ohio Aug. 19, 2009)("appellant engaged in furtive conduct reflective of a consciousness of guilt"). This is so, even where DVR claims that he was not guilty, and only flushed

---

confession"); State v. Haverty, 475 P.2d 887, 889 (Wash. Ct. App. 1970)("In the instant case when the officers first saw the defendant with the coat and tag [the condition of which suggested that the coat had been removed from the store without the defendant paying for it], the sight aroused suspicion warranting further inquiry to determine if there was an innocent explanation dispelling the suspicion aroused. When, however, defendant gave an improbable explanation of how he came into possession of the coat, probable cause to arrest arose."); People v. McFarland, 376 P.2d 449, 452 (Cal. 1962)("Possession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt")(citations omitted).

the SIM card because he was afraid of being thought guilty. DVR did not volunteer a reasonable explanation for how he came to be lawfully in possession of the cell phone. He still has not done so; his only explanations on this point have rested on supposition and speculation that an unknown third party slipped the phone into DVR's bag for reasons unknown.

Furthermore, no eyewitness to the precise moment of theft is necessary to create probable cause to suspect someone of theft. It is not the case that there was "no factual evidence" that "a cell-phone was actually stolen"; Bower, Jr. stated that his phone was in his locker, and the phone was then located in the possession of DVR without Bower, Jr.'s permission or authority. These circumstances constitute "factual evidence" (albeit circumstantial "factual evidence") to support the proposition that a cell phone was actually stolen. Again, neither a confession, nor videotape of the incident, nor eyewitness reports of the moment of theft, are required. See Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 790 (3d Cir. 2000)(where witness told police officer that art teacher admitted "that she had no permission to take the property she was found loading into her car," notwithstanding plaintiff's argument that this "does not establish probable cause in all cases[,]" e.g., "a teacher might be taking home materials belonging to the school to prepare class lessons[,]" probable

cause existed as a matter of law, even making all reasonable inferences in plaintiff's favor where witness also told police officer that teacher "did intend to deprive the District of its property" by giving it to community center").[18]

While probable cause in § 1983 cases is normally a question of fact left to the province of a jury, see Wilson v. Russo, 212 F.3d 781, 796 (3d Cir. 2000)(Pollak, J., concurring in part and dissenting in part)(citations omitted), a district court may "conclude in the appropriate case, however, that probable cause did exist as a matter of law if the evidence, viewed most favorable to Plaintiff, reasonably would not support a contrary factual finding." Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).[19]

---

[18] See also id. at 790 n.8 ("Merkle also contends that Hahn lacked probable cause because he failed to interview other witnesses . . . prior to making the arrest. However, Hahn had every reason to believe a credible report from a school principal who witnessed the alleged crime. This report alone sufficiently established probable cause. Hahn was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed")(citations omitted); Dintino v. Echols, 243 F. Supp. 2d 255, 264-66 (E.D.Pa. 2003)(same)(citations omitted).
[19] Compare Patzig v. O'Neil, 577 F.2d 841, 849 (3d Cir. 1978)("evidence of lack of probable cause was sufficient to allow the issue to go to the jury" where "only direct evidence of [decedent's] condition at the time of her arrest" was testimony that decedent "displayed no signs of intoxication when her car was stopped, and . . . had had only two drinks that night" "strongly supported a lack of probable cause" although witness was decedent's friend; "the weight of [her] testimony is for a jury, not a court, to decide.") with Groman v. Twp. of Manalapan, 47 F.3d 628, 635 n.10 (3d Cir. 1995)(summary judgment

The Court discerns no error in its recitation or analysis of the reasons for Dr. Scelso's suspension of DVR, nor in its conclusion that probable cause existed, as a matter of law. Accordingly, Plaintiffs' motion on this ground is denied.

### D. Improper Ruling on DVR's Credibility

Plaintiffs argue that the Court erred when it stated: "There is no factual dispute that [DVR] admitted he took young Bower's cell phone from the locker room of the high school wrestling team." [Docket Item 82-3 at 10 (citing Docket Item 80 at 5).] Plaintiffs argue that DVR in fact disputed and continues to dispute this fact. [Docket Item 82-3 at 10-11.]

The Court finds this argument unpersuasive. All that was intended by the Court's reference to DVR admitting he "took" the phone from the locker room is that DVR admitted that he <u>physically conveyed</u> the phone away from the locker room in his gym bag, knowingly or unknowingly.[20] The Court's Opinion did not

---

appropriate for officers where "uncontested evidence demonstrates that [fellow defendant officer] told each of them that [plaintiff] had punched her. This is sufficient for them to have believed probable cause existed").

[20] <u>See</u> Docket Item 82-3 at 11 ("DVR consistently stated that he never realized someone's cell-phone was in his gym bag until he first saw it in the bag shortly before he exited the school bus at his home. Even then he had no way of knowing who owned the phone or how it came to be in his gym bag. And there is a very plausible explanation of how the cell-phone came to be in DVR's gym bag: someone else found (or perhaps stole) the cell-phone and placed it in DVR's bag without his knowledge in order to have DVR <u>unwittingly transport the cell-phone out of the school building</u>.")(emphasis added).

in any way rely on the premise that DVR admitted to knowingly taking the cell phone. Accordingly, Plaintiffs' motion for reconsideration on this point is denied as well.

### E. **Monell** Liability

Plaintiffs argue that the Court erred by granting summary judgment on their claim of municipal liability pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), because Plaintiffs adduced sufficient evidence to allow a reasonable finder of fact to conclude that "Egg Harbor Township (E.H.T.) has . . . an established policy in the Uniform Memorandum of Agreement between the E.H.T. school system and the E.H.T. Police Dept. whereby the police regularly report to the E.H.T. schools about suspected criminal activities which occur off the school campus involving public school students." [Docket Item 82-3 at 12 (emphasis in original).]

The Court agrees that the evidentiary record supports, at least, a genuine dispute of material fact as to the existence of an official municipal policy; where the Court parts ways with Plaintiffs is that it does not agree, on the evidentiary record before the Court at summary judgment, that a reasonable finder of fact could conclude that "this official policy led to due process [or other constitutional] violations which the defendants are ignoring." [Docket Item 82-3 at 14.]

Plaintiffs cite to two alleged violations of the Memorandum of Agreement itself, id. at 15, neither of which amount to a constitutional violation. See n.12, supra (allegations that wrong officer wrote email and that only verbal, rather than written, report were authorized under the Memorandum of Agreement do not make out a constitutional violation).[21]

Plaintiffs also argue that "there was no probable cause to believe DVR stole the phone, or to contradict his statement to the police and the vice-principal that he found the phone in his bag." [Docket Item 82-3 at 15.] The Court disagrees for the reasons stated above, and does not find that the Memorandum of Agreement led to any constitutional violation on this ground.

Finally, Plaintiffs argue that "Vice-Principal Scelso did no investigation at all. . . . Dr. Scelso simply took the e-mailed word of Officer Ware that DVR was guilty of the theft without speaking to Officer Ware or to Officer Spano, the official liason officer." Id. As the Court pointed out in its

---

[21] Furthermore, the Court disagrees that the second of these alleged violations of the Memorandum of Agreement even violated the Memorandum; Plaintiffs' argument that only a verbal report was permitted is premised upon the supposition that "off-campus" incidents can only be reported in writing if they involve "drugs, weapons, or threats of harm made to students or faculty" ignores the reality that both the Officer Defendants (and/or the liason officer, Officer Spano) and Dr. Scelso would have been justified in concluding that DVR committed a theft offense on campus on the basis of the circumstantial evidence described at length above and in the Court's previous Opinion.

earlier Opinion, although "Plaintiff asserts various arguments regarding what Dr. Scelso failed to do, he cites to no authority to support his interpretation of what Dr. Scelso had a legal obligation to do." [Docket Item 80 at 22, 22 n.4, citing N.J.A.C. 6A:16-7.2 and noting that that provision requires a district board of education to hold an "informal hearing" with the student to be suspended, its requirements "do not include hearings, interviews or conversations with anyone else, including but not limited to other students or law enforcement involved in the underlying incident."). Moreover, the evidentiary record is clear that Dr. Scelso made the decision to suspend DVR after reading the emails and after speaking to DVR. DVR's own statements (and any omissions or elisions that may have been in them) were reasonably part of what Dr. Scelso relied upon in making the decision to suspend DVR. Without deciding or implying that there was some baseline level of "investigation" Dr. Scelso was required to undertake, Dr. Scelso undoubtedly "investigated" the incident when she interviewed DVR about it.

The Court again discerns no error here in concluding that Plaintiffs have not adduced adequate evidence that the Memorandum of Agreement was a municipal policy that led to a constitutional violation, allowing for Monell liability.

Plaintiffs appear, possibly, to argue that DVR's procedural due process rights were violated by the alleged failure of Dr. Scelso to provide "an explanation of the evidence forming the basis of the charges," pursuant to N.J.A.C. 6A:16-7.2 because "Dr. Scelso never presented DVR with evidence against him. How could she when there was no evidence?" [Docket Item 82-3 at 15-16.] The Third Circuit has held that a person's due process rights are not violated when a school suspends him following allegations of criminal activity from "credible sources." Jerrytone v. Musto, 167 F. App'x 295, 301 (3d Cir. 2006). Moreover, the Third Circuit has also affirmed the adequacy (on due process grounds) of an informal procedure that essentially only involved interviewing the accused student and the accuser in a sexual misconduct case and suspending the accused student on (as assumed for summary judgment purposes) the sole say-so of the accuser. Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 149-50 (3d Cir. 2005)(citing Goss v. Lopez, 419 U.S. 565, 572-73, 577, 581-82 (1975) and S.G. v. Sayreville Bd. of Educ., 333 F.3d 417, 424 (3d Cir. 2003)).

Keeping in mind that the undisputed evidence shows that Dr. Scelso made the decision to suspend DVR after speaking with DVR himself (and that this, in and of itself, contradicts Plaintiffs' position that "All Dr. Scelso could possibly have said would be, 'DVR, I am suspending you for theft because

50

Officer Ware says it was a theft.' But due process requires something more[,]" id. at 16), Plaintiffs' procedural due process claim cannot be sustained under Alvin v. Suzuki, as described in Section IV.B., supra.

Accordingly, Plaintiffs' motion for reconsideration on this ground is denied.


V.    **Conclusion**

For the reasons explained above, Plaintiffs' motion for reconsideration [Docket Item 82] will be granted as to Plaintiffs' claims of unlawful entry (or unconstitutional search) under the Fourth Amendment and § 1983 and as to Plaintiff DVR's claim of unconstitutional seizure within Plaintiffs' home under the Fourth Amendment and § 1983. The claim of unconstitutional seizure in the home will be viable only if the defendants are liable for unlawful entry into the home, for otherwise there was ample probable cause to seize or arrest DVR outside the home. The Court notes that, at any trial on these two claims, the jury may be instructed both that probable cause to arrest DVR existed and that DVR was not formally arrested by the Defendant Officers at any time. See Fed. R. Civ. P. 56(g).

The Court's previous grant of summary judgment to Defendant Officers Ware, Defazio, and Burns upon these claims will be

vacated in part, and summary judgment as to these claims against Ware, Defazio, and Burns will be denied to the extent Plaintiffs claim the Officer Defendants conducted a warrantless entry into their home, and to the extent Plaintiff DVR claims he was subjected to an unlawful detention in his home subsequent to the warrantless entry. In all other respects, Plaintiffs' motion for reconsideration will be denied. The Board Defendants' motion for sanctions [Docket Item 84] will likewise be denied, as will Plaintiffs' cross-motion for sanctions [Docket Item 86].

An accompanying Order will be entered.


**August 16, 2018**                          **s/ Jerome B. Simandle**
Date                                   JEROME B. SIMANDLE
                                       U.S. District Judge